# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

June 18, 2021

<u>VIA ECF & EMAIL</u>
Hon. Kiyo A. Matsumoto
U.S. District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   <u>United States v. Tyshawn Corbett, *et al.*</u>, No. 20-cr-213 (KAM)

Dear Judge Matsumoto:

Defendant Qawon Allen moves for dismissal of the indictment based upon the substantial failure to comply with the Jury Selection and Service Act in selecting the grand jury that returned this indictment. As set forth below, Mr. Allen seeks dismissal, or, as an initial step, a hearing, on three grounds: (1) the grand jury was not randomly selected from the venire of summoned qualified jurors, (2) the district's jury pool systematically underrepresents Black and Latino residents, and (3) the district's jury selection otherwise violates the statute by excluding non-active voters, double-counting certain jurors who appear on the voter registration and motor vehicle rolls, and failing to geographically proportion the jury pool.[1]

This motion is joined by Mr. Allen's codefendants.

---

[1] In support of this motion, Mr. Allen is submitting Exhibits labeled A through G. Exhibits D through G are materials the clerk's office disclosed to counsel subject to the Court's protective order. *See* ECF No. 85. They are being filed separately under seal in accordance with that order.

1

I.      **Background**

A.  **EDNY jury selection plan**

The Eastern District of New York selects grand and petit juries according to its jury selection plan, attached as Exhibit A, which it enacted pursuant to the Jury Selection and Service Act ("JSSA"), 21 U.S.C. § 1863. The district has no statutory divisions but is a single district comprised of Richmond, Kings, Queens, Nassau, and Suffolk Counties. 28 U.S.C. § 112. The selection plan applies equally to juries empaneled in its two courthouses, in Brooklyn and Central Islip. Ex. A § 1. Jury selection is delegated, under the Chief Judge's supervision, to the Clerk of Court. *Id.* § 3.

Jury selection follows three steps, as prescribed in the JSSA: (1) the clerk creates a master jury wheel of potential jurors; (2) the clerk randomly selects names from the master jury wheel for creation of a qualified jury wheel; and (3) qualified jurors are summoned and selected for service as needed.

For the first step of creating the master jury wheel, the district uses one master jury wheel for selecting grand and petit juries. *Id.* § 5. This master wheel is drawn at random from two sources: voter registration lists for the district's five counties and, as a supplement, New York State Department of Motor Vehicles lists of driver's licenses for the district. *Id.* §§ 4, 5. As discussed below, the source lists used by the clerk are limited to active voters and driver's license holders; because of this, inactive voters and non-driver's license holders are excluded from the master jury wheel.

When randomly selecting names from these source lists for the master jury wheel, the clerk must ensure that they proportionally represent the populations of the five counties. Ex. A

2

§ 4. The master jury wheel is emptied and refilled approximately every two years: by the September following a presidential election, and then two years after that. *Id.* § 5.

For the second step of creating the qualified jury wheel, the clerk draws names at random from the master jury wheel for qualification. *Id.* § 6. These potential jurors are mailed questionnaires to fill out within ten days of receipt. Those questionnaires ask for information regarding the jurors' demographics as well as whether they are qualified, exempt, or excused from qualification. Using the responses, the clerk creates a qualified jury wheel from which potential jurors are summoned.

Anyone who returns a questionnaire is qualified unless he or she is not a citizen, is younger than 18 years old, has resided in the district for less than a year, cannot speak English or write English well enough to complete the questionnaire, is mentally unfit, or is charged with or convicted of a felony offense. *Id.* § 9. Jurors can also identify bases for excusal or exemption, such as being over 70 years old, being a member of the clergy, providing essential care to a young child or elderly or infirm adult, practicing as an attorney or healthcare provider, having previously served on a jury in the prior two years, being essential to a business, actively serving in the military, being employed by a police or fire department, or serving a federal public official. *Id.* §§ 7-8. These categories of exclusion and exemption do not include travel hardship.

Finally, the clerk summons names at random from the qualified jury wheel for jury service. *Id.* §§ 13-14. The clerk draws these names publicly and maintains an anonymized list of who has been summoned. *Id.* §§ 12-13. The clerk maintains lists of the disposition of these summoned jurors at jury selection, including who was selected to serve, who did not respond to the summons, and who responded but was exempted, deferred, excused, or otherwise not chosen

3

for service. *See* Ex. E (disposition spreadsheet for this grand jury); 28 U.S.C. §§ 1865(a), 1866(d) (providing that clerk's office must record disposition for summoned jurors). The clerk is also supposed to maintain a record of the "specific reason" for a juror's disqualification, excusal, exemption, or exclusion from service. Ex. A § 10.

### B.  Indictment in this case

The defendants in this case are charged with various racketeering and firearms offenses occurring in Brooklyn and Queens. Under the district's division of business, this case is not assigned to the Long Island courthouse, because the charged offenses did not occur in Nassau or Suffolk County. *Guidelines for the Division of Business Among District Judges* § 50.1(d)(1) (E.D.N.Y.), *available at* https://img.nyed.uscourts.gov/files/local_rules/guidelinesdj.pdf. Nevertheless, on June 18, 2020, the defendants were indicted by a grand jury sitting in Central Islip. The government took the unusual step of indicting this Brooklyn case on Long Island because of the COVID-19 pandemic. Due to the application of state and local stay-at-home orders, the government could not convene a quorum of grand jurors in Brooklyn for the spring and summer of 2020, but was able to convene at least one regular grand jury in Central Islip beginning on June 11, 2020. *See* Ex. C (June 25, 2020 letter from U.S. Attorney's Office to Chief Judge Mauskopf). That Central Islip regular grand jury had been selected in October 2019, *see* Ex. D ( Oct. 7, 2020 letter from Clerk of Court, Douglas Palmer), and indicted these defendants in its second sitting after the COVID-19 outbreak.

## II.      The Selection of this Grand Jury Substantially Failed to Comply with the JSSA.

Litigants in federal court have a statutory right under the JSSA to "grand and petit juries selected at random from a fair cross-section of the community in the district or division wherein

the court convenes." 28 U.S.C. § 1861 (1994). Title 28 U.S.C. § 1867(a) and (d) provide that in criminal cases a defendant may move to dismiss an indictment and to stay any further proceedings against him, if there has been a "substantial failure to comply" with the provisions of the JSSA in selecting the grand jury which indicted him, until such time as the failures have been corrected. "Mere technical violations of the procedures prescribed by the Act do not constitute substantial failure to comply with its provisions." *United States v. LaChance*, 788 F.2d 856, 870 (2d Cir. 1986).

Although relief under the statute is only available for substantial non-compliance with the statute, the defendants need not prove "prejudice" to win dismissal of the indictment. *See United States v. Jackman*, 46 F.3d 1240, 1250 (2d Cir. 1995) (Walker, J., dissenting) (absent failure to comply with procedural requirements, a JSSA statutory claim was viable notwithstanding lack of underrepresentation proof); *United States v. Contreras*, 108 F.3d 1255, 1266 (10th Cir. 1997) ("'In the [Jury Selection and Service] Act, Congress set out a uniform, relatively strict scheme for jury selection. Congress included a new remedy for substantial violations of the Act, regardless of whether the litigant challenging the jury had been prejudiced by the jury.'") (quoting *United States v. Kennedy*, 548 F.2d 608, 612 (5th Cir. 1977)). Indeed, "[t]he legislative history of 28 U.S.C. § 1867(d) reveals that Congress deliberately excised a prejudice component that had existed in a prior version of the bill which was ultimately enacted as the Jury Selection and Service Act of 1968 and codified, in part, as Section 1867(d)." *United States v. Okiyama*, 521 F.2d 601, 604 (9th Cir. 1975) (citing House Report No. 1076); *see also United States v. Coleman*, 429 F. Supp. 792 (E.D. Mich. 1977) (dismissing indictment notwithstanding absence of proof that it caused any disparity). Ultimately the measure of whether a procedural failure

warrants relief depends on whether or not an important JSSA policy is frustrated, and how significant the deviation is. *See, e.g.*, *Coleman*, 429 F. Supp. 792; *United States v. Davis*, 546 F.2d 583, 589 (5th Cir. 1977) ("Determining the substantial compliance question requires that the alleged violations of the Act be weighed against the goals of the statute.").

Where the JSSA claim is based on the underrepresentation of a distinctive group in the grand jury selection process, a defendant must show that it is not fair and reasonable in relation to the number of such persons in the community, and that the underrepresentation is the result of systematic exclusion. *See*, *e.g.*, *United States v. Rioux*, 97 F.3d 648, 654, 660 (2d Cir.1996). In short, claims of underrepresentation in grand jury selection share the same doctrinal test as fair cross-section challenges brought under the Sixth Amendment. *Id*. at 660; *accord United States v. Miller*, 116 F.3d 641, 659 (2d Cir. 1997).

Here, the selection of this grand jury violated the JSSA in three critical respects: (1) based on the information we have received, this grand jury was not randomly selected from a pool of qualified, non-excused jurors, but reflects a *de facto* exclusion of New York City residents, especially from Brooklyn and Staten Island; (2) the qualified jury wheel substantially underrepresents Black and Latino jurors; and (3) the master jury wheel otherwise violates the statute by not being drawn from a complete list of voters, not giving all potential jurors an equal chance to be selected, and not proportionally representing the district's counties. Each violation is a substantial failure to comply with the statute and merits relief.

### A. Qualified New York City jurors, especially from Staten Island and Brooklyn, were systematically not selected for service.

The JSSA's "aim is to assure all litigants that potential jurors will be selected at random from a representative cross section of the community and that all qualified citizens will have the

opportunity to be considered for jury service." H.R. Rep. No. 90–1076 (1968) ("House Report"), reprinted in 1968 U.S.C.C.A.N. 1792, 1792. The statute thus sets forth procedures for jurors in each federal district to be "selected at random from a fair cross section of the community in the district or division wherein the court convenes," 28 U.S.C. § 1861, and states that no person is to be excluded from service as a juror for any invidious reason. *See id.* §§ 1862, 1863(a). Further, it provides that "no person or class of persons shall be disqualified, excluded, excused, or exempt from service," except as expressly permitted by statute. *Id.* § 1866(c).

Those statutory exceptions to eligibility for service include, in relevant part:

- Disqualifications, such as being a noncitizen, being under the age of 18, or not having command of the English language. *Id.* § 1865(b). These are adopted verbatim in section 9 of the district's jury selection plan.

- Exemptions of military personnel, members of police and fire departments, and federal public officials. *Id.* § 1863(b)(6). These exemptions can be found in section 8 of the district's jury plan.

- Excusals for "groups of persons or occupational classes whose members shall, on individual request therefor, be excused from jury service" that each judicial district determines in its own jury selection plan. *Id.* § 1863(b)(5). These groups of people are listed in section 7 of the district's jury plan. As discussed above, they are categories of people based on occupation, age, and caretaking responsibilities, but not based on other forms of hardship.

- Excusals on an individual basis by the court or, if the district permits, by the clerk based "upon a showing of undue hardship or extreme inconvenience." *Id.* § 1865(c). Section 10 of the district's jury plan incorporates this case-by-case hardship determination. It only authorizes the Court, and not the clerk, to excuse potential jurors on this basis. *See also* Ex. F. (May 19, 2021 letter from Clerk of Court, Douglas Palmer) ("No, § 10(1) is not part of the excusal/disqualification process by the clerk . . . .").

Of significance, neither the JSSA nor the district's jury plan authorizes the excusal, exemption, or exclusion of qualified jurors based on their geographical location or travel hardship. The only provision that would govern this is section 10 of the district's jury plan,

7

which permits a judge to excuse an individual juror based on undue hardship or inconvenience. Otherwise, excluding or exempting a person or group of persons based on where they live falls within the JSSA's prohibition on denying qualified jurors the right to serve.

The grand jury that returned this indictment was selected from 600 summoned qualified jurors. By county, 151 (25%) were from Kings, 160 (27%) were from Nassau, 155 (26%) were from Queens, 101 (17%) were from Suffolk, and 33 (5%) were from Richmond. Ex. B (Martin declaration) ¶ 143. But even though New York City residents — *i.e.*, individuals from Richmond, Kings, and Queens Counties — made up more than half of the total number of summoned jurors, they represented only 20, or 25%, of the jurors selected from this panel. *Id.* ¶ 145. By contrast, jurors from the Long Island counties accounted for approximately 44% of all summoned jurors, but made up 75% of those selected. *Id.* Indeed, jurors from the Long Island counties had a rate of participation nearly 10 times greater than their Brooklyn counterparts. *Id.* ¶ 147 (24% of summoned Suffolk and 22% of summoned Nassau jurors were selected to serve, in comparison to 2.65% of summoned Brooklyn jurors).

To be sure, the JSSA does not guarantee a grand jury that precisely proportionally represents the district. *See United States v. Miller*, 116 F.3d 641, 657 (2d Cir. 1997) (by enacting JSSA, "Congress did 'not [mean to] require that at any stage beyond the initial source list[,] the selection process shall produce groups that accurately mirror community makeup'") (quoting House Report, reprinted in 1968 U.S.C.C.A.N. at 1794)). But the law does protect the right to *random* selection from a fair cross-section of the community, which "'virtually eliminates the possibility of impermissible discrimination and arbitrariness at all stages of the jury selection process, and thereby tends to insure that the jury list will be drawn from a cross section of the

community." *Id.* at 656 (quoting House Report, reprinted in 1968 U.S.C.C.A.N. at 1794). Here, the dilution of New York City representation on this grand jury, especially from Brooklyn, among this group of qualified, non-excused jurors could not have been the result of randomness. *See* Ex. B ¶¶ 168-70. Instead, it appears to reflect a systematic *de facto* excusal or exclusion of New York City jurors, particularly from Brooklyn and Staten Island, in violation of the statute.

Of the 600 qualified jurors summoned for this jury selection, 80 were selected as jurors for this grand jury and other matters that day. Ex. F ¶¶ 8-9. Of the remaining 520, 39 did not respond, three were deferred, nine were disqualified, 287 were excused, and 182 appeared but were not selected. Ex. B. ¶ 142. The 287 excused accounts for jurors who were not selected by operation of two provisions of the district's jury plan: section 7, for excusals for certain preapproved groups of people upon individual request, and section 8, for mandatory exemptions. *See* Ex. F. ¶¶ 3-4. It does not include people excused based on individual requests to the court based upon personal undue hardship or extreme inconvenience. *Id.* ¶ 5.[2]

The distribution of these 287 exclusions and exemptions is not equal across the district's counties. The clerk excused more than half of all jurors summoned from Brooklyn and two-thirds of Staten Island jurors, but only about 40% of Long Island jurors. Ex. B ¶ 149 (showing that "66.67% of persons from Richmond County were excused, 56.95% of persons from Kings County were excused, 47.10% of persons from Queens County were excused, 41.88% of persons from Nassau County were excused, and 38.61% of persons from Suffolk County were excused").

---

[2] Based on the information we received in response to our discovery requests, it appears that the only people who may have been excused based on an individual determination of undue hardship or extreme inconvenience are the three deferrals who, according to the clerk's office, "requested and received a deferral due to a hardship" and "remain in the wheel and can be called in a future jury pool." Ex. F. ¶ 1.

Based on the information we have received to date, we do not know exactly why there is an unequal distribution of excusals among the counties — although the clerk is required to note the reason for each excusal and exemption, Ex. A § 10, those notes were not produced in response to the disposition records we requested. We acknowledge, however, that some variation in the excusal rate would not be surprising, since jurors from the City's more distant counties would understandably be more inclined to seek excusal from jury service in Central Islip. Still, the higher rates of excusals cannot be blamed for the gross disparity between the rates of participation for New York City and Long Island counties for these 600 summoned jurors. The disparity fully occurs in the final step of the process: selecting jurors from the remaining pool of responding qualified jurors who were not otherwise excused or exempted.

After factoring in the number of summoned jurors who did not appear, were deferred or disqualified, or were excused, there were 262 qualified jurors who could have been selected: ten from Richmond County, 47 from Kings, 65 from Queens, 83 from Nassau, and 57 from Suffolk. Ex. B ¶¶ 160-61. A truly random selection would be expected to yield an even rate of selection for each county from this remaining pool of jurors. *Id.* ¶ 165. Here, that expected result would be three jurors from Richmond County, 14 from Kings, 20 from Queens, 25 from Nassau County, and 17 from Suffolk County. But of the 80 selected jurors, there were 0 from Richmond County, four from Kings, 16 from Queens, 35 from Nassau, and 25 from Suffolk. Ex. B. ¶¶ 166. Accordingly, from this pool of qualified, non-excused jurors, 0% of Staten Island, 8.5% of Brooklyn, and 24% of Queens residents were selected, in comparison to 42% of Nassau and 43% of Suffolk residents. *Id.* ¶ 163.

10

This represents a 46% reduction from the share of expected New York City jurors (20 selected jurors, rather than the 37 expected), and a 71% increase in the share of expected Long Island jurors (60 jurors, rather than the 43 expected). It also yields comparative disparities along racial lines. For example, White jurors from the Long Island counties had almost twice the odds of being selected than the average summoned juror. *Compare id.* ¶ 151 (noting that 13.3% of summoned jurors were selected), *with id.* ¶ 152 (noting that 21% of summoned White Nassau residents, and 24% of summoned White Suffolk residents, were selected). But Black jurors from Brooklyn, who represent more than half of the district's population of Black eligible population, *id.* ¶ 155, had less than half the odds of being selected as the typical summoned juror, and less than a quarter the odds of their White Long Island counterparts. *See id.* ¶ 153 (noting that only 5% of summoned Black Brooklyn jurors were selected).

The clerk's office has not provided an explanation for this substantial disparity between participation rates of qualified, non-excused New York City and Long Island jurors for this jury. The juror disposition records we received only identify whether jurors showed up for jury service, were disqualified, deferred, or excused (but without any explanation), or were ultimately selected. *See* Exs. E, F. But what information we have reveals at least a *prima facie* case that this grand jury was not randomly selected from this pool of qualified, non-excused jurors. Even with the small number of persons in the group of 262 qualified jurors who responded to their summons and were not excused or exempt, the number selected as jurors from Kings County is two standard deviations too low and the number selected as jurors from Suffolk County is two standard deviations too high. Ex. B ¶ 168. The disparity between their actual and expected selections "represents a systematic or non-random" underrepresentation for Brooklyn, and

overrepresentation for Suffolk. *Id.* ¶¶ 169-70. It shows, in other words, that the geographical disparity in this grand jury was not the product of the sort of random selection that Congress mandated in the JSSA.

This selection bias in favor of Long Island jurors, and against New York City residents, especially from Brooklyn, would constitute a violation of the JSSA. *See* 18 U.S.C. § 1861 18 U.S.C. § 1866(b)(5). The information we have received, however, is insufficient to determine how this bias occurred. Although the court ordered production of the clerk's records regarding the disposition of summoned jurors in this case, *see* ECF No. 85 at 16-17, the records we received to date appear to be incomplete. As clarified in its letter of May 19, 2021, the clerk's office did not provide information about excusals or exclusions by the Court, Ex. F ¶¶ 3, 5, even though the clerk's office is supposed to maintain a record of them, Ex. A § 10. Indeed, as far as we can tell, no such excusals or exclusions occurred and, therefore, they cannot be the cause of the further reduction in the number of New York City residents selected for jury service. Rather, there appears to have been some other selection mechanism, unaccounted for in the district's jury plan or permitted by statute, in favor of jurors who lived close to Central Islip, and against those who did not.

Given this clear evidence of geographical favoritism in the selection of this jury, the Court should, at a minimum, conduct a hearing to determine what caused it. This should include calling the jury clerk or clerk of court to testify. *See, e.g.*, *Miller*, 116 F.3d at 657 (district court convened examination of jury clerk to resolve JSSA claim); *Jackman*, 46 F.3d at 1243 (same). There should also be an opportunity for the parties to request additional discovery that will be relevant to any such examination, including information (if it exists) regarding excusals and

exclusions of these summoned jurors under section 10 of the jury plan, as well as data concerning other jury selections in the Central Islip courthouse germane to whether this selection bias is a pattern or practice or simply an anomaly in this grand jury's selection.

### B. The district's qualified jury wheel substantially underrepresents Black and Latino jurors.

The Sixth Amendment guarantees a criminal defendant a jury selected from a fair cross section of the community. *Taylor*, 419 U.S. 522, 530 (1975). The JSSA extends that fair cross-section right to federal grand juries. *United States v. Brown*, 116 F.3d 466 (2d Cir. 1997) (summary order); *United States v. Shader*, 472 F. Supp. 3d 1, 3 (E.D.N.Y. 2020); ECF No. 85 at 4-5.[3] Unlike a challenge brought under the Fifth Amendment, "a jury selection system yielding a significant underrepresentation of a minority group in jury venires can violate the 'fair cross-section' requirement of the Sixth Amendment, even if proof of discriminatory intent necessary for a Fifth Amendment violation is absent." *United States v. Biaggi*, 909 F.2d 662, 677 (2d Cir. 1990) (citing *Duren v. Missouri*, 439 U.S. 357, 368 n.26 (1979)).

In *Duren*, the Supreme Court set forth three elements that a defendant must show to establish a *prima facie* violation of the fair-cross-section requirement: (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Id.* at 364. Once the defense makes a *prima*

---

[3] This claim is brought under the JSSA, but to the extent the Sixth Amendment also guarantees that federal grand juries be drawn from a fair cross-section of the community, we assert it as a basis for relief. As discussed above, the doctrinal test for a constitutional and statutory fair cross-section violation is the same. *Rioux*, 97 F.3d at 660.

*facie* showing of systematic underrepresentation of a distinctive group, it becomes the government's burden to justify this underrepresentation "by showing attainment of a fair cross section to be incompatible with a significant state interest." *Duren*, 439 U.S. at 368-69.

Here, the defendants present the following *prima facie* case: approximately 20% fewer Black and Latino potential jurors are in the qualified jury wheel than expected, given their share of the district's population. This underrepresentation is not the result of random chance, but is a product of the district's creation of the wheel, which is based upon incomplete voter registration records and inadequate supplementation from the motor vehicle rolls.

### 1.  First *Duren* prong: distinctive group.

Black and Latino people are "distinctive" groups in the community, and a claim of underrepresentation of those groups meets the first prong of a fair-cross section claim. *United States v. Jackman*, 46 F.3d 1240, 1246 (2d Cir. 1995).

### 2.  Second *Duren* prong: significant underrepresentation.

In considering the second *Duren* element, the Court must determine "whether either or both of these two 'distinctive' groups are 'significant[ly] underrepresent[ed]' in the jury selection process." *Id.* (citing *Biaggi*, 909 F.2d at 677). The relevant comparison, for purposes of assessing the representativeness of the system, is between the number of minority persons in the population and the number of persons belonging to the class found in the jury pool. *Id.* (citing *Duren*, 439 U.S. at 365-66).

Over the years, the Second Circuit has utilized various statistical models for evaluating claims of "significant underrepresentation." In *United States v. Rioux*, 97 F.3d 648, 655 (2d Cir.

1996), the Court of Appeals reviewed the three most common models: absolute disparity, comparative disparity, and statistical decision theory ("SDT").

Absolute disparity measures the difference between the group's representation in the general population and the group's representation in the qualified wheel. For example, if Black individuals compose 10% of the entire population but only 2% of the qualified wheel, the absolute disparity is 8%. The absolute numbers approach is the average difference in the number of jurors per venire due to the underrepresentation. *Id.*

Comparative disparity "'measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service. Comparative disparity is calculated by dividing the 'absolute disparity' of a group . . .by the group's percentage of the population and then multiplying by 100%." *Id.* The comparative approach tells the difference between a group's actual share of a jury pool and their expected share, given their presence in the district as a whole.

Finally, statistical decision theory "calculates probabilities and measures the likelihood that underrepresentation could have occurred by sheer chance. Under this method, if one can determine that it is statistically improbable that the jury pool resulted from random selection, then there is imperfection in the jury selection system. . . . The intellectual core of SDT is random selection." *Id.* SDT is the preferred method of calculating jury underrepresentation for at least one state supreme court. *See State v. Lilly*, 930 N.W.2d 293, 304 (Iowa 2019) (holding that the threshold for establishing systematic underrepresentation should be one standard deviation after rejecting the absolute disparity and comparative disparity methods).

Regardless of the method of analysis used, Black and Latino individuals are significantly underrepresented in the Eastern District qualified jury wheel, as set forth in the attached declaration of expert Jeffrey O'Neal Martin. *See* Ex. B ¶¶ 30-80. That declaration performs all three measurements on the qualified jury wheel used to select this grand jury, each of which shows a "statistically significant" underrepresentation of Blacks and Latino individuals in the jury pool.[4]

The absolute disparity for Black individuals on the qualified jury wheel is 4.45% underrepresentation (20.10% minus 15.65%). *Id.* ¶ 50. The absolute disparity for Latino persons is 2.86% under-representation (16.93% minus 14.07%). *Id.* ¶ 55. For this grand jury, the absolute disparity of Black jurors persisted or worsened at every stage in the jury selection process. *Id.* ¶¶ 51-54.

The comparative disparity for Black persons from the qualified jury wheel is 22.12% underrepresentation (4.45% divided by 20.10%). That is, between one-fifth to one-quarter of the Black persons expected in the qualified jury wheel are missing. *Id.* ¶¶ 61-62. The comparative disparity for Latino persons from the qualified jury wheel is 16.87% underrepresentation (2.86% divided by 16.93%). *Id.* ¶ 68. As with absolute disparity, the comparative disparity of Black jurors persisted or worsened at every stage in the jury selection process. *Id.* ¶¶ 67.

---

[4] As explained in Mr. Martin's declaration, these measurements are conducted by comparing the proportion of Black and Latino jurors in the *qualified* jury wheel with the corresponding proportion of Black and Latino eligible jurors in the district's population. The qualified, rather than master, jury wheel is used for these calculations because the only self-reported racial and ethnicity information for the jury is drawn from completed qualification questionnaires. Ex. B ¶ 40. (The clerk's office also uses qualified jury wheel data when measuring the representativeness of the district's jury pool *Id.* ¶¶ 30, 41.) The district's jury-eligible population is drawn from 2019 Census Bureau data. *Id.* ¶¶ 31, 35-39.

The SDT analysis confirms that the underrepresentation of Black and Latino persons is significant and systematic, and not the product of chance. *Id.* ¶ 73. Specifically, the percent of Black persons on the qualified jury wheel differs from the percent of Black persons in the population by 28 standard deviations. *Id.* ¶ 75. For Latinos, the difference in percentage is 18 standard deviations. *Id.* ¶ 76. The underrepresentation of both groups, therefore, "is not the result of random factors, chance, or luck, but is the result of a systematic practice that underrepresents [those distinctive groups]." *Id.* ¶¶ 75, 76.

The degree of underrepresentation reflected in the data for both Black and Latino persons is significantly greater than the level of underrepresentation which the Second Circuit found troubling in *Biaggi*. Relying on the absolute disparity test to asses underrepresentation, the Court found an absolute disparity of 3.6% for Black individuals and 4.7% for Latino individuals. 909 F.2d at 677. Although the Court held that there was no fair cross-section or JSSA violation, the Circuit stressed that "the facts of this case press the . . . 'absolute numbers' approach to its limit, and [it] would find the Sixth Amendment issue extremely close if the underrepresentation had resulted from any circumstance less benign than use of voter registration lists." *Id.* As explained next, however, this underrepresentation has a "less benign" root: the district's reliance on incomplete voter registration lists, and inadequate supplementation with motor vehicle rolls.

### 3. Third *Duren* prong: systematic underrepresentation.

The final prong the defendants must show is that this underrepresentation is systematic, meaning that it is "inherent in the particular jury-selection process utilized." *Duren*, 439 U.S. at 669. To demonstrate this, "a party need only establish that the underrepresentation is due to the systematic exclusion of a cognizable group during the jury selection processes, not that the

system intentionally discriminates against any particular group, as required by an Equal Protection claim." *Biaggi*, 909 F.2d at 677.

The systematic underrepresentation of Black and Latino jurors in this district's qualified wheel follows from two shortcomings in the district's construction of the jury pool: the use of incomplete voter registration lists and inadequate supplementation with motor vehicle rolls.

The district's jury pool principally draws from registered voters. Ex. A § 4. But the voter registration lists used to populate the master and qualified jury wheels exclude 323,753 eligible jurors, or 6.38% of registered voters in the district, because the local boards of elections have deemed them "inactive." Ex. B ¶¶ 87-88. "Inactive voters" are voters who are still registered to vote but whose status is changed to "inactive" because the county elections boards have received information, whether accurate or not, that the voter has moved. *See Common Cause/New York v. Brehm*, 432 F. Supp .3d 285, 290 (S.D.N.Y. 2020) ("Voters are moved to inactive status when a County Board receives information indicating that a voter may no longer be living at her address of registration."). The information received by the county boards is often inaccurate. *See id*. at 293 ("In practice, tens of thousands of New York voters are improperly registered to vote as inactive, even though they continue to reside at their address of registration.") Judge Nathan, in her ruling in *Common Cause*, attributed this problem to flaws in the databases used: that of the United States Postal Service and the National Change of Address registry. *Id*.; *see also* Ex. B ¶¶ 90, 92-95 (observing that inactive voter designation is often attributable to mail delivery problems, which are likely to be more common for people living in shared buildings).

Definite conclusions cannot be drawn regarding inactive voters' race and ethnicity because that information is not recorded in the data provided. Ex. B ¶ 101. But there is reason to

believe that inactive voters are more diverse and younger than active voters, based on the

demographics of inactive voters in other jurisdictions. *Id.* ¶ 95. For example, inactive voters

statewide in New York were disproportionately Black and Latino in the 2016 presidential

election. they collectively made up 24% of the state's active voters but 33% of its inactive voters,

while, by contrast, White voters made up 69% of the state's active voters and 59% of its inactive

voters. Decl. of Marc N. Meredith at 12, Table 4, *Common Cause/New York v. Brehm*, No. 17-

cv-6770 (AJN) (S.D.N.Y. Sept. 25, 2019), ECF No. 135-1. The exclusion of these hundreds of

thousands of eligible jurors from the district's jury pool likely exacerbated the

underrepresentation of Black and Latino jurors in the qualified wheel.

The district's jury plan is designed to prevent this sort of demographic

underrepresentation by supplementing its source data with names drawn from the New York

Department of Motor Vehicles for the district's counties. Ex. A § 4. The supplementation failed,

however, likely for two reasons.

*First*, the only motor vehicle records that the clerk's office requests and incorporates into

the jury pool are driver's licenses. Ex. B ¶ 99; Ex. G at 3 (Jan. 10, 2017 letter from Clerk of

Court, Douglas Palmer, requesting "*most recent* drivers license lists vehicle registration list").

The DMV also issues photo idenfification non-driver's licenses to New York State residents,

who are more likely to rely on public transportation, live in the district's urban areas, and be

racially diverse than driver's license holders. *See, e.g.*, John Pawarsant, *The Driver License*

*Status of the Voting Age Population in Wisconsin*, Employment & Training Inst., Univ. of

Milwaukee-Wisconsin (June 2005), *available at*

https://www.brennancenter.org/sites/default/files/legacy/d/download_file_50902.pdf (finding

that, in study of Wisconsin, minorities in Milwaukee were half as likely to have driver's licenses than white residents statewide), *cited by Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 221 n.25 (2007) (Souter, J., dissenting); Ryan P. Haygood, *The Past as Prologue: Defending Democracy Against Voter Suppression Tactics on the Eve of the 2012 Elections*, 64 Rutgers Univ. L. Rev. 1019, 1055 & n.248 (2014) (nationwide, 19% of eligible Black drivers do not have driver's licenses, in comparison to 3% of Whites).

*Second*, the jury plan blunts the motor-vehicle records' intended salutary effect of increasing jury pool diversity. It does so by populating the master jury wheel from the merged voter and motor vehicle source list in proportion to each county's share of the voter registration lists — and not to each county's share of the motor vehicle list or to its census data. Ex. B ¶ 100; *see* Ex. A § 4 (citing 28 U.S.C. § 1863(b)(3)). By using each county's share of the voter registration rolls as the basis for its share of the master jury wheel, the district inevitably loses the increased diversity from the motor vehicle source list.

Accordingly, as the SDT analysis shows, the underrepresentation of Black and Latino jurors in the qualified jury wheel did not occur by chance, but was systematically produced by operation of the district's jury plan. That satisfies the third *Duren* prong.

### C.  The selection of this grand jury otherwise violated the JSSA.

The method of selecting this jury violates the JSSA in other ways that merit relief. Specifically, this grand jury was selected from an incomplete set of voter registration lists; duplicate entries in the merged source lists upset the randomness of this jury's selection; and there is geographical disproportion in the jurors' representation in the master and qualified jury wheels.

*First*, the JSSA authorizes the use of voter registration lists, 28 U.S.C. § 1863(b)(2), as long as they produce representative juries.[5] "Voter registration lists" are defined, in relevant part, as "official records maintained by State or local election officials of persons registered to vote in either the most recent State or the most recent Federal general election." 28 U.S.C. § 1869(c). Thus, as a clear matter of statutory interpretation, anyone who is registered to vote in the most recent State or Federal general election should be on the lists. This district, however, does not use the full list of registered voters in sourcing its jury wheel because it does not include inactive voters. Ex. B ¶¶ 81-83. Inactive voters are registered to vote at their precinct, but they are arbitrarily absent from the lists used by the clerk's office. Their exclusion from the possibility of jury service violates the JSSA's plain text and meaning.

*Second*, the JSSA guarantees that jurors will be randomly selected. To assure randomness, this district's jury selection plan requires that "[t]he selections of names from the source lists, the master wheel, and the qualified wheel must also insure that the mathematical odds of any single name being picked are substantially equal." Ex. A § 4; *see also In re United States*, 426 F.3d 1, 6 (1st Cir. 2005) (discussing same "equal odds" provision in District of Maine's jury plan). In practice, however, this "equal odds" aim has been frustrated because of inadequate deduplication of the merged voter registration and motor vehicles source list.

The deduped merged source list produced by the clerk's office contains 7,445,208 persons who are all over the age of 18. But according to census data, the district's jury-eligible

---

[5] The JSSA also permits districts to draw their jury wheels from "the lists of actual voters of the political subdivisions within the district." 28 U.S.C. § 1863(b)(2). These are "the official lists of persons actually voting in either the most recent State or the most recent Federal general election." *Id.* § 1869(d). In this district, the jury plan does not use lists of actual voters for its jury wheel, but, instead, the voter registration lists as its primary source. Ex. A § 4.

population (*i.e.*, residents at least 18 years old and a citizen) in this district in 2017 is 5,436,290 persons. The de-duplicated merged source list has 2,008,918 more entries than the jury eligible population, which is 36.95% larger than the jury eligible population. Ex. B ¶¶ 111-12, 114. This significantly larger number results from many thousands of duplicate entries that were not eliminated during the deduplication process. Consequently, there are many people in the district's source lists who have multiple chances of being placed in the master jury wheel and, ultimately, of being selected for service. That upsets the jury plans "equal odds" provision and denied the defendants the randomly selected grand jury to which they were entitled.

*Third*, the JSSA requires that the district's counties be proportionally represented in the master jury wheel. 28 U.S.C. § 1863(b)(3). That proportionality is lacking here. In absolute terms, Queens County is overrepresented by 2.55%, at the expense of Kings, Nassau, and Suffolk. Ex. B ¶ 117-22. In comparative terms, this means that there are approximately 10% more Queens jurors in the master juror wheel than would be expected, given their share of the voter registration rolls. *Id.* ¶ 123. That imbalance in the master jury wheel merits relief, too.

## III.    Conclusion

As set forth above, this grand jury's selection denied Mr. Allen and his codefendants their right to a panel randomly selected from a fair cross-section of the community and in compliance with the JSSA's procedural rules. The indictment returned by this Central Islip grand jury should therefore be dismissed. At a minimum, a hearing should be granted, especially on the essential question of how so many New York City potential jurors were disproportionately not selected for jury service, despite being qualified and not excused or exempted.

Dated: June 18, 2021
       Brooklyn, NY

Respectfully submitted,

/s/ _____
Benjamin Z. Yaster
Deirdre D. von Dornum
Federal Defenders of New York, Inc.
*Attorneys for Qawon Allen*

Encls.  Exs. A-G

cc:    Counsel of Record